DECISION AND JUDGMENT
{¶ 1} This is an appeal from a judgment of the Williams County Court of Common Pleas, Juvenile Division, that terminated the parental rights of appellants Christal O. and Eric O. and awarded permanent custody of Steven O. to appellee Williams County Department of Job and Family Services. For the following reasons, the judgment of the trial court is affirmed. *Page 2 
 {¶ 2} Appellant Eric O. asserts as his sole assignment of error that the decision of the trial court was against the weight of the evidence. In support of his claim, however, appellant father does not set forth any argument based on the record. In fact, father does not argue that his parental rights should not have been terminated. Instead, he briefly discusses in general terms the unfortunate nature of this case and simply asserts that the decision of the trial court should be reversed and custody restored to mother because she "deserves a chance." Appellant father's sole assignment of error is not well-taken.
 {¶ 3} Appellant mother sets forth the following assignment of error:
 {¶ 4} "The trial court erred against the manifest weight of the evidence and abused its discretion when it did not consider the evidence that the mental and emotional condition of the mother was improved substantially at the time of the hearing and that the child would be able to have an adequate, stable permanent home with her within one year after the hearing pursuant to 2151.414(E)(2) O.R.C."
 {¶ 5} Steven O. was born in August 2000. Appellee's involvement with appellant and her child has been extensive and essentially uninterrupted since Steven was one year old. The Williams County Department of Job and Family Services ("agency") initially became involved with appellant and Steven in October 2001. The case was closed on November 11, 2001, but was reopened two weeks later when the agency received another complaint. On December 12, 2001, the agency filed for protective supervision, which was granted in January 2002, and terminated in January 2004, due to agency regulations prohibiting protective supervision cases to be open for more than two years. *Page 3 
 {¶ 6} The agency again became involved in January 2004 through a voluntary case plan. However, in May 2005, the agency was again granted protective supervision of Steven. On February 6, 2006, the agency filed a complaint alleging that Steven was a neglected and dependent child; the following day, the agency was granted emergency custody. Steven has remained in the agency's custody since that time. On July 10, 2006, the agency was granted temporary custody. At a hearing held on February 6, 2007, the trial court found that compelling reasons existed to continue Steven in the temporary custody of the agency. Steven continued in foster care.
 {¶ 7} On July 3, 2007, the agency filed a motion for permanent custody. An attorney and a guardian ad litem were appointed for the child. Several days of hearings were held between January 28 and February 15, 2008. Mother and father were represented by counsel, although father was not present as he was incarcerated.
 {¶ 8} By judgment entry filed March 4, 2008, the trial court awarded permanent custody of Steven to the Williams County Department of Job Human Services.
 {¶ 9} Appellant mother now asserts in her sole assignment of error that she has improved substantially between July 2007 and the time of the hearing by consistently attending counseling, maintaining a job, finding possible housing, and relying more on her own intellect and judgment.
 {¶ 10} In granting a motion for permanent custody, the trial court must find that one or more of the conditions listed in R.C. 2151.414(E) exist as to each of the child's parents. If, after considering all relevant evidence, the court determines by clear and *Page 4 
convincing evidence that one or more of the conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1). Further, pursuant to R.C. 2151.414(D), a juvenile court must consider the best interest of the child by examining factors relevant to the case including, but not limited to, those set forth in paragraphs 1-5 of subsection D. Only if these findings are supported by clear and convincing evidence can a juvenile court terminate the rights of a natural parent and award permanent custody of a child to a children's services agency. In re William S. (1996), 75 Ohio St.3d 95. Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 11} The record reflects that at the permanent custody hearing the trial court heard testimony from appellant, several agency caseworkers, psychologists who evaluated appellant and Steven, and various other social service providers who worked with appellant over a period of more than five years.
 {¶ 12} The agency first became involved with appellant in 2001 when it investigated a complaint that Steven was filthy, had severe diaper rash, was drinking spoiled milk from dirty bottles, and was taken to his babysitter in the morning without having been fed. After a 30-day investigation, the case was closed. It was reopened one week later due to complaints about loud noise coming from the house at 2 a.m. and concerns that Steven might be left home alone. Upon investigation, the agency found *Page 5 
that the house was a mess with an awful stench. The agency filed for protective supervision and provided appellant with a homemaker to assist her in making the house safer and cleaner.
 {¶ 13} The case was closed in December 2004. It was reopened in April 2005 following a call from the Bryan Medical Group reporting that, while in the medical office, appellant hit Steven in the face and knocked him to the floor. When the agency staff went to appellant's home shortly thereafter, they found it unsafe and filled with garbage. Among other problems, there were 15 small chickens in an aquarium and an electrical cord running from the kitchen, into the bathroom, over the bathtub to the clothes washer. The agency again filed for protective supervision, which remained in effect until a motion for temporary custody was filed in February 2006. The temporary custody motion was filed as a result of reports that Steven was going to school wearing filthy clothes; on many mornings, Steven was so dirty that the school staff bathed him when he arrived. Steven had tantrums at school and was hitting other children and his teachers. Appellant admitted she was not taking her medication at that time. Caseworkers learned that the night before the motion was filed, appellant and Steven had spent all night sitting on their front porch after appellant had a fight with the man with whom she was living. At that time, agency staff reported seeing no progress in the home and believed that a chaotic home environment was contributing to Steven's behavior problems at school. Steven was behind academically, socially, cognitively and developmentally. The motion for temporary custody was granted and Steven has *Page 6 
remained in the agency's custody since that time. At the time of the hearing, Steven was seven and a half years old and living in a therapeutic foster home.
 {¶ 14} Geri Severs, supervisor of children's services at the agency, testified at the permanent custody hearing that Steven was doing significantly better in the foster home. His behavior had become more controlled, although there were still concerns with lying, stealing and aggression. Severs testified that Steven has attention deficit hyperactive disorder as well as anger and aggression issues. Steven sees a doctor regularly for medical management and a psychologist for counseling. She testified further that Steven requires monitoring at all times at school and at home.
 {¶ 15} The agency worked with appellant on organizing the home and providing structure for Steven, keeping the home safe, budgeting, and on her own mental health care. Since protective supervision began in 2005, the agency worked with appellant to clean her house. The agency paid for a dumpster so that appellant, who has a tendency to hoard, could make the home cleaner. The agency also arranged for a homemaker to go into the home weekly to work with appellant. A caseworker from the Maumee Valley Guidance Center also went to the home to help appellant. Severs testified that she was last in the home on January 17, 2008, 11 days before the hearing, and did not see significant improvement in the living conditions. There was still a great deal of clutter. There were items such as a large bag of chicken feed on the floor even though there were no longer chickens in the house, a bag of charcoal and a space heater, all of which would be within Steven's reach. An ongoing problem with garbage in the home had caused *Page 7 
problems with rodents indoors. There also were many items in the yard that could prove harmful to Steven. At that time, the home was heated with four space heaters because there was no propane in the tank. Appellant told Severs she was trying to keep the indoor temperature at 55 degrees. A hose ran from the kitchen to the bathroom for the clothes washer.
 {¶ 16} Severs testified that Steven was evaluated by a psychologist in October 2007. The psychologist stated that Steven needs a highly structured environment with near constant supervision; firm boundaries with clearly communicated rules and expectations; consistent consequences for inappropriate behavior and rewards for good behavior; and guardians who are educated about ADHD and its effective treatment, who can advocate effectively for Steven's educational needs. Severs testified that she did not believe appellant was currently capable of fulfilling any of those needs, although she did appear to understand attention deficit disorder. Severs further testified that she believed Steven has a bond with his mother and that his mother loves him. She does not think that appellant is currently capable of providing the things that Steven needs to be successful in life. Severs testified that she did not know of any services at the agency's disposal that had not already been offered to appellant. Finally, she testified that she did not think conditions would be satisfactory for Steven to return to his mother's home at that time or within a reasonable time.
 {¶ 17} Several other caseworkers testified as to their contact with appellant and Steven and as to the agency's concerns about living conditions, finances, parenting and *Page 8 
mental health issues between 2001 and the time of the hearing. Homemakers assigned to appellant's case helped her work on making the home clean and safe, sometimes washing dishes and sorting through boxes of items to decide what to keep and what to discard. One homemaker from the agency testified that she helped appellant with budgeting and parenting skills during 2006 and 2007, working with appellant two or three times a week at one point in 2007. She testified that upon visiting the home she found conditions that would be hazardous to a child of Steven's age. On one occasion, while helping appellant clean the house she found a rat's nest in a cupboard; on another occasion a nest was found in the stove. She created "master cleaning lists" for appellant, identifying in brief, concise language tasks she needed to complete in each room. The checklists were posted prominently in each room. She further testified that appellant's response to the lists was inconsistent. At the time the homemaker discontinued her services with appellant in July 2007, appellant was not successfully budgeting her money and had not been successful in implementing structure in her home environment. Appellant did not appear to be meeting her own daily basic living needs. Social workers testified that appellant would occasionally make some improvement in her living conditions but that the home would eventually revert back to the original unacceptable condition.
 {¶ 18} One caseworker who worked with appellant from April 2002 until July 2007, testified that when she first began going into the home, it appeared that Steven ran the household; in her opinion, appellant and Steven were more like equals than mother and child. Steven's hygiene was poor and his behavior uncontrollable. These factors and *Page 9 
others led the agency to request and receive temporary custody in February 2006. Upon investigation at that time, the agency determined that there were no relatives available to take custody of Steven. The caseworker testified that Steven had made great progress in his current foster home, becoming healthier, speaking more clearly, behaving more appropriately and progressing in school. The caseworker testified that she did not see substantial improvements in the safety of appellant's home or with regard to appellant's financial situation. She also was unable to see significant improvement in appellant's ability to meet her daily needs or manage her mental health.
 {¶ 19} The trial court also heard testimony from the principal of the school where Steven attended preschool from August 2003 until February 2006. The principal testified as to Steven's severe behavioral problems, which worsened when appellant failed to get refills on his medication. He also testified that appellant would attempt to follow through on their suggestions as far as Steven's hygiene and the need for structure at home but would regress after a brief period. The principal has continued to monitor Steven's progress in school and stated that he has made significant gains in academic skills which he believed would not have been made if Steven had remained in the home with appellant.
 {¶ 20} Steven's guardian ad litem since 2001 testified that Steven's speech has improved greatly since February 2006. He listens and is functioning well within the rules of his foster parents' household and at school with a one-on-one aide, with frequent supervision and redirecting when he loses focus. She visited appellant's home in *Page 10 
December 2007, approximately four weeks before the hearing, and did not consider the conditions in the home acceptable for Steven to return. The house was disorganized and was being heated with space heaters because appellant did not have the money to pay her propane bill. She further testified that she did not believe at that point that appellant was able to provide the structure and consistency Steven needs and still did not appear to show improvement in her ability to meet her own needs.
 {¶ 21} Dr. Diane Peters testified that she conducted psychological evaluations of appellant over the course of four meetings during January and February 2007. Appellant was diagnosed with adult attention deficit/hyperactivity disorder, major depressive disorder and mixed personality disorder with histrionic and narcissistic traits. She stated that due to appellant's own mental health issues, she would have difficulty keeping her own life in order and was not likely to be able to adequately advocate for Steven or provide the structure, routine and medication regulation he needs.
 {¶ 22} Dr. Stan Edwards, a psychologist from the Children's Resource Center who has worked with Steven for two years, testified that Steven has made progress while in foster care. He further testified that Steven suffers from attention deficit/hyperactivity disorder, bi-polar disease and oppositional-defiant disorder. He emphasized that stability is very important to Steven, especially in light of his diagnoses, and that it is essential for him to have a highly structured, controlled, one-on-one setting in order to continue making progress. *Page 11 
 {¶ 23} In granting a motion for permanent custody, the trial court must find that one or more of the conditions listed in R.C. 2151.414(E) exist as to each of the child's parents. If, after considering all relevant evidence, the court determines by clear and convincing evidence that one or more of the conditions exists, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1). Further, pursuant to R.C. 2151.414(D), a juvenile court must consider the best interest of the child by examining factors relevant to the case including, but not limited to, those set forth in paragraphs 1-5 of subsection D. Only if these findings are supported by clear and convincing evidence can a juvenile court terminate the rights of a natural parent and award permanent custody of a child to a children's services agency. In re William S. (1996), 75 Ohio St.3d 95. Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 24} This court has thoroughly reviewed the record of proceedings in this case, from appellant's first involvement with the agency in 2001, through the hearing on the motion for permanent custody and the trial court's decision. The trial court's decision in this case addresses all of the relevant statutory factors in detail. The trial court found that the Williams County Department of Job and Family Services made reasonable efforts to prevent the continued removal of Steven from the home by providing appellant with case plan management, individual counseling, psychological evaluation, constant homemaker *Page 12 
services and visitation over a period of six years. Pursuant to R.C. 2151.414(E)(1), the trial court found that although those services were offered, the conditions that caused the initial removal of Steven from appellant's care had not been remedied and that Steven could not be returned to either parent within a reasonable period of time. The trial court also found, pursuant to R.C. 2151.414(E)(2), that appellant's chronic mental and emotional issues are so severe that it makes her unable to provide an adequate, stable, permanent home for Steven at the present time and within one year after the hearing. Pursuant to R.C. 2151.414(E)(4), the trial court found that appellant demonstrated a lack of commitment to Steven by failing to provide an adequate permanent home for him, despite more than two years of services and assistance. Additionally, the trial court found, pursuant to R.C. 2151.414(E)(12), that Steven's father, Eric O., was incarcerated at the time of the hearing and would not be available for at least 18 months after the filing of the complaint and disposition.
 {¶ 25} In considering the best interest of the child pursuant to R.C. 2151.414(D), the trial court found that Steven is in need of a permanent plan and that an award of permanent custody would facilitate an adoptive placement. The trial court noted the guardian ad litem's recommendation that permanent custody was in Steven's best interest.
 {¶ 26} Based on our review of the record as summarized above, we find that the trial court's decision was supported by clear and convincing evidence that an award of permanent custody to the Williams County Department of Job and Family Services was *Page 13 
in Steven O.'s best interest. Accordingly, appellant's sole assignment of error is not well-taken.
 {¶ 27} On consideration whereof, this court finds that substantial justice has been done the parties complaining and the judgment of the Williams County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Williams County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Peter M. Handwork, J., Mark L. Pietrykowski, P.J., Thomas J. Osowik, J., CONCUR. *Page 1